UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Civil No. 12-1799 (PAM/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM AND ORDER** |
| Douglas Arthur Sabby, JUTO, LLC, Thomas Mogren, Judy Mogren, and Tanya Y. Pizel, | |
| Defendants. | |

This matter is before the Court on the parties' cross-Motions for Summary Judgment. For the reasons that follow, Plaintiffs' Motion is granted and Defendants' Motion is denied.

**BACKGROUND**

This is a case in which the Government seeks to reduce its federal tax liens against Defendant Douglas Sabby in the amount of $604,393.45 to a judgment.[1] The Government also seeks to foreclose on the home in which Sabby resides in order to recover a portion of the unpaid tax lien amount. The relevant facts are largely undisputed.

In 1997, Defendant Tanya Pizel and Sabby, who were dating at the time, purchased the property at issue for approximately $270,000. (Sabby Dep. (Docket No. 39-1) at 78.)

---

[1] Sabby incurred the federal tax assessments during several tax periods between 1997 and 2002. (Burns Decl. ¶ 6.) The IRS recorded the assessments in 2005 and 2007. (Id.)

Sabby paid a portion of the downpayment and shared in household expenses, renovation costs, and mortgage payments. (Id. at 78-79, 84-85; Pizel Dep. (Docket No. 39-2) at 71-72.) Sabby was not listed, however, on the mortgage or title to the property. (Sabby Dep. at 78, 81, 82.) Sabby explained that he did not want to be on the mortgage or title because he did not want the house to be subject to forfeiture in the event he was "busted" for bookmaking. (Id. at 82-83.) Pizel and Sabby married in 1999.

In 2003, Sabby pled guilty to various federal crimes associated with gambling, including money laundering, operating an illegal gambling business, and tax evasion, and was sentenced to 30 months in prison. Pizel pled guilty to conspiracy and served five months in prison.

During the criminal proceedings, Sabby and Pizel took out a $205,000 second mortgage on the property. (Gov't Ex. 7; Sabby Dep. at 96.) They used the proceeds to pay the Government in connection with their criminal cases and to pay off the original mortgage and other debts. (Sabby Dep. at 96.) Both Sabby and Pizel signed the second mortgage. (Gov't Ex. 7.) Sabby and Pizel again lived together in the house after their release from prison, but separated a short time later. Pizel moved out of the house in 2004.[2] (Sabby Dep. at 17.) Sabby stayed in the house and assumed the financial and other responsibilities with respect to the property. Pizel's name remained on the title, however. Sabby testified that Pizel did not transfer title to him because of his tax liability with the IRS. (Id. at 132.)

---

[2] Sabby and Pizel have been separated since 2004, but are still married. (Sabby Dep. at 20.)

In 2007, Sabby fell behind on the mortgage payments and faced default and foreclosure. (Id. at 111-13.) In December 2007, Sabby's "very good" friend Tom Mogren loaned Sabby $235,000. (Id. at 64, 122; Mogren Dep. (Docket No. 39-4) at 18.) The loan is memorialized in a promissory note reflecting a seven percent annual interest rate on the principal. (Gov't Ex. 9.) The note is not tied to the house and is unsecured. (Id.) Mogren and Sabby maintain, however, that they verbally agreed that Sabby would sell the house and use the proceeds to repay the loan. (Sabby Dep. at 123; Mogren Dep. at 42-44.) There has been no such sale, but Sabby initially made sporadic interest payments on the loan. (Sabby Dep. 147-49; Mogren Dep. at 59-60.) Sabby has made no payments since 2008. (Sabby Dep. at 150.)

Sabby used $206,000 of the loan to the bank to pay off the second mortgage, and $20,000 to pay Pizel for her interest in the property.[3] (Gov't Exs. 10-11; Sabby Dep. at 124-25, 131.) Sabby used the remainder to pay other bills. (Sabby Dep. at 125-26.) Mogren understood that Sabby and Pizel jointly owned the house, but that title was in Pizel's name only. (Mogren Dep. at 28, 31-32, .) Mogren has known since 2007 that Sabby owed money to the IRS. (Id. at 22-23; Sabby Dep. at 132, 207-08.)

Sabby has lived in the house with a roommate, Greg Olson, since approximately 2005. (Sabby Dep. at 69-74.) Olson pays Sabby rent each month and Sabby uses the money to pay household expenses. (Id.)

---

[3] Mogren did not give Sabby the loan money directly, but instead paid the bank the mortgage balance and Pizel for her interest in the house at Sabby's direction. (Sabby Dep. at 138-39, 190-91; Gov't Exs. 10-11.)

On January 20, 2010, the IRS filed a tax lien against Sabby with the Ramsey County Recorder & Registrar of Titles. (Gov't Ex. 28.) Sabby attempted to resolve the tax lien and retained William Tschida and Ronald Urbanski of Quest Investigations to represent him. (Tschida Dep. (Docket No. 39-5) at 23-25, 46.) Sabby did not disclose his interest in the property to the IRS. (Gov't Ex. 30.) But the IRS independently learned of Sabby's interest the property and requested details. (Id.) In response, Sabby disclosed that the property is titled in Pizel's name, has a market value of approximately $250,000, that Mogren loaned Sabby money to cover the mortgage, and that Sabby tries to pay Mogren on a monthly basis. (Id. Ex. 31.)

On October 15, 2010, the IRS sent a letter to Pizel informing her that it planned to file a nominee lien under her name because, according to the title, she was the sole owner of the property. (Id. Ex. 34.) The IRS explained that Pizel could avoid the nominee lien and adverse credit ramifications by recording a quitclaim deed in favor of Sabby within 30 days. (Id.) The IRS conveyed this same information to Tschida via telephone on or about October 15. (Tschisda Dep. at 99-102; Gov't Ex. 37 at 265-26.)

Just four days later, Sabby and Pizel signed a quitclaim deed prepared by Mogren's attorney conveying the property to Defendant JUTO, LLC, which is owned by Mogren and his wife Judy. (Gov't Exs. 13, 17.) Mogren did not tell his attorney about Sabby's IRS problems. (Gerstein-Timm Dep. (Docket No. 39-6) at 50-51.) Had he done so, she would have recommended a lien search to ensure that the property was free from encumbrances. (Id. at 52-53.) Both Sabby and Mogren testified that the deed satisfied the earlier $235,000

loan. (Sabby Dep. at 162; Mogren Dep. at 70.) Sabby still lives in the house but pays no rent to JUTO or the Mogrens. (Sabby Dep. at 164-65; Mogren Dep. at 72.) Mogren has been to the house twice in the fifteen years Sabby has lived there. (Mogren Dep. at 45-46.) He has not been there since the transfer to JUTO. (Id.)

In June 2011, the IRS filed a tax lien in Ramsey County naming JUTO, LLC as Sabby's nominee. This suit followed. The Government has sued Sabby, JUTO, the Mogrens, and Pizel seeking the $604,393.45 tax lien and, most relevant here, a determination that JUTO is Sabby's nominee and that the property is subject to the lien. Pizel has defaulted. (Docket No. 12.) Sabby does not dispute the amount of the lien, but maintains that he has no legal interest in the property. Defendants JUTO and the Mogrens have jointly filed a Motion for Summary Judgment, as has the Government.

**DISCUSSION**

Summary judgment is appropriate where there are no genuine issues of material fact and the case can be decided as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the burden of proof and the evidence must be viewed in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). Yet "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Id. at 323; Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996). A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson, 477 U.S. at 256.

**A.    The Tax Liens and JUTO**

The federal tax lien statute sets forth the circumstances under which property rights may be used to satisfy tax liens:

> If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount . . . shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.

26 U.S.C. § 6321 (emphasis added). Defendants do not dispute that the IRS assessments became tax liens on property belonging to Sabby. (Defs.' Supp. Mem. (Docket No. 41) at 13.) The issue before the Court is whether the Government can foreclose on the house, now owned by JUTO, to partially satisfy Sabby's tax debt. Defendants first argue that the tax liens are not valid against JUTO because JUTO was a "purchaser" under 26 U.S.C. § 6323 and because the IRS did not comply with notice requirements.

A party seeking protection under § 6323 must show (1) that it is a "purchaser" under § 6323(h)(6) and (2) that the Government did not file a notice in compliance with § 6323(f). "The term 'purchaser' means a person who, for adequate and full consideration in money or

6

money's worth, acquires an interest (other than a lien or security interest) in property which is valid under local law against subsequent purchasers without actual notice." 26 U.S.C. § 6323(h)(6). "[A] party meeting the definition of 'purchaser' has a superior right in property subject to any federal tax lien filed after the date upon which that party became a bona fide purchaser." United States v. Phillips, 715 F. Supp. 81, 83 (S.D.N.Y. 1989).

The issue here is whether Mogren's 2007 loan can be deemed consideration for the 2010 property transfer to JUTO.[4] The consideration requirement is determined by federal law. Cipriano v. Tocco, 757 F. Supp. 1484, 1493 (E.D. Mich. 1991). Federal law is clear that "performance of a pre-existing legal duty is no consideration for a separate instrument executed by the promisee to whom the obligation is owed." Phillips, 715 F. Supp. at 84; see also United States v. Register, 717 F.Supp. 2d 517, 525-26 (E.D. Va. 2010) (holding that "past consideration cannot support a future bargain and thus cannot constitute 'consideration[]'" under § 6323); United States v. Sweeny, 418 F. Supp. 2d 492, 498 (S.D.N.Y. 2006) ("Past consideration is insufficient to render Peter a 'purchaser' under the statute."); Pennbright Indus., Inc. v. IRS, No. H-88-487, 1990 WL 18061, at *7 (S.D. Tex. Jan. 22, 1990) ("Performance of a pre-existing legal duty is not consideration for a separate instrument executed by the promisee to whom such obligation is owed."); United States v. Pavenick, 197 F. Supp. 257, 259 (D.N.J. 1961) (same). This is consistent with core principles of contract law. See Restatement (Second) of Contracts § 73 ("Performance of a

---

[4] For purposes of the present Motions, the Court will treat the transfer to JUTO, which Mogren owns, as a transfer to Mogren.

legal duty owed to a promisor which is neither doubtful nor the subject of honest dispute is not consideration; but a similar performance is consideration if it differs from what was required by the duty in a way which reflects more than a pretense of bargain.").

Defendants argue that the above-cited case are contravened by Rodeck v. United States, 697 F. Supp. 1508 (D. Minn. 1988) (MacLaughlin, J.), in which Judge MacLaughlin concluded that a tax debtor could assign his interest in a contract for deed to the mother of his child in exchange for a release of future child support obligations. Id. at 1510, 1512. Rodeck is not analogous to this case because it involved a future legal obligation, rather than an antecedent debt.

Here, Sabby deeded the property to Mogren as payment for the existing 2007 loan, which was supported by separate consideration, i.e., Sabby's promise to pay back the debt with interest. The 2010 deed transaction required a contemporaneous exchange of value in order to qualify Mogren as a purchaser. It is undisputed that there was no such exchange. Lacking consideration, JUTO cannot be considered a purchaser within the meaning of the statute.

Defendants argue that they always intended that the property would serve as security for the loan and that as such, the property was part of the original transaction. The record does not support this self-serving argument. The promissory note does not mention the property and there is no separate instrument reflecting that Mogren had a security interest in the property. Moreover, § 6323(h)(6) expressly excludes security interest holders from the

definition of "purchaser." Therefore, even if Mogren had a security interest in the property, he still would not qualify a purchaser.

Because JUTO is not a purchaser under the statute, the Court need not consider the issue of notice.

**B.  Sabby's Interest in the Property**

Defendants next argue that even if JUTO was not a purchaser, the tax liens did not attach to the property because Sabby had only an inchoate or marital interest in the property. Whether Sabby's interest in the property constitutes "property and rights to property" for the purposes of § 6321 is a question of federal law. United States v. Craft, 535 U.S. 274, 278 (2002). The answer to this federal question, however, depends on state law because the federal tax lien statute itself "creates no property rights but merely attaches consequences, federally defined, to rights created under state law." Id. (quoting United States v. Bess, 357 U.S. 51, 55 (1958)). In other words, "[s]tate law determines only which sticks are in a person's bundle." Id. "Whether those sticks qualify as 'property' for purposes of the federal tax lien statute is a question of federal law." Id. at 279. Therefore, in determining the existence of property rights, courts first consult state law to determine the nature of the property interest and then look to "federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation." Id. at 278 (quoting Drye v. United States, 528 U.S. 49, 58 (1999)).

Defendants' argument that Sabby only has a marital or inchoate interest in the property is misplaced. Under Minnesota law, marital property interests do not vest until the commencement of a dissolution proceeding. United States v. Alexander, No. 4-89-85, 1991 WL 13727, at *1 (D. Minn. Jan. 18, 1991) (Rosenbaum, J.) (citing Miller v. Miller, 352 N.W.2d 738, (Minn. 1984). Likewise, inchoate property interests vest at the time of a spouse's death. Id. at *2. Neither contingency is present here. The Court will therefore turn directly to the Government's argument that Pizel, and now JUTO, have been mere nominees for Sabby, the beneficial owner of the property.

"A nominee is one who holds bare legal title to property for the benefit of another." Scoville v. United States, 250 F.3d 1198, 1202 (8th Cir. 2001). The Court considers the following factors in determining nominee status:

(1) Whether the individual paid little or no consideration;

(2) Whether the taxpayer placed the property in the individual's name in anticipation of a lawsuit or liability;

(3) Whether there is a close relationship between taxpayer and the individual;

(4) Whether the taxpayer exercises dominion and control over the property; and

(5) Whether the taxpayer continued to enjoy the benefits of the property.

United States v. Johnson, No. 05-3017, 2007 WL 1695740 (D. Minn. Mar. 30, 2007) (Erickson, M.J.).

As an initial matter, there can be little dispute that Pizel was Sabby's nominee both before and after Sabby paid her $20,000 for her interest in the property in December 2007.

Sabby admitted that he did not put his name on the title at the time of purchase because he wanted to avoid foreclosure by the Government. This means that from 1998 to 2007, Pizel held a one half interest in the property for herself and the other half interest as Sabby's nominee. In 2007, when Pizel relinquished her remaining interest in the property to Sabby but maintained title in her name, Pizel became Sabby's nominee for the entire property. The real question is whether JUTO was Sabby's nominee after the 2010 transfer.

### 1. Lack of Consideration

As noted, the record supports a finding that the transfer to JUTO lacked consideration. Even if an antecedent debt could serve as consideration for the transfer, the objective evidence does not support Defendants' contention that the property transfer was designed to pay Mogren back for the loan he extended to Sabby in 2007. Although Sabby and Mogren may have contemplated that the property should serve as collateral for the loan, there is no concrete evidence or legal documentation establishing the property as security for the loan. As such, the Court must rely on the loan documentation and the quitclaim deed, neither of which references the property as security for the loan. Accordingly, the Court finds that there was insufficient consideration for the transfer.

### 2. Anticipation of Legal Action

The record also supports a finding that Sabby transferred the property to JUTO in anticipation of adverse action by the IRS. Sabby and Pizel transferred title to JUTO within days of learning that the IRS was planning to file a nominee lien against Pizel, as sole owner of the property. The timing of the transfer to JUTO is highly suspicious, especially in light of Mogren's longstanding knowledge that Sabby owed money to the IRS. It strains credulity to suggest that the transfer to JUTO would have taken place absent the IRS's notice to Pizel. The Court therefore finds that the transfer occurred in anticipation of IRS action.

### 3. Close Relationship

It is undeniable that Mogren and Sabby had a close relationship at the time of the transfer. Both Sabby and Mogren acknowledge that they are "good friends" and have been for decades. The record independently supports this characterization. Perhaps the best evidence of their close relationship is the fact that Mogren loaned Sabby $235,000 without a security interest, despite knowing of Sabby's tax problems. When Sabby stopped making payments on the loan, Mogren did nothing because he understood that his friend did not have the means to pay him. Indeed, had Mogren and Sabby not been close friends, it is unlikely Mogren would have agreed to the transfer.

### 4. Control Over Property/Benefits of Property

Sabby exercises complete dominion and control over the property. Sabby lives in the house, pays household expenses, and does not pay rent to JUTO or Mogren. He fully enjoys

the property as his own, and there has been no apparent change in his interest since the transfer. Mogren has not even visited the home since the transfer. The only indicia of Mogren's interest is the bare title in JUTO's name.

In sum, the record establishes that Sabby has ownership rights in the property that is subject to the IRS tax liens at issue and that JUTO is Sabby's nominee. As such, the federal tax liens are superior to any claim raised by Defendants.

**CONCLUSION**

There are no genuine issues of material fact precluding summary judgment in favor of Plaintiff. Accordingly, **IT IS HEREBY ORDERED that:**

1. Plaintiffs' Motion for Summary Judgment (Docket No. 30) is **GRANTED**;

2. Defendants' Motion for Summary Judgment (Docket No. 32) is **DENIED**;

3. Judgment on Count I of the Complaint is entered in favor of the United States and against Douglas Sabby in the amount of $604,393.45, plus statutory additions that accrue thereon from November 28, 2013;

4. Judgment on Count II of the Complaint shall be entered in favor of the United States and against all Defendants as set forth above; and

5. The federal tax liens at issue are hereby foreclosed against the property located at 1015 Horizon Street, Vadnais Heights, Minnesota 55127. The Horizon Street Property shall be sold free and clear of any claims of Defendants subject to further order of the Court. A separate order of sale enforcing this Judgment

against the Properties will issue.

Dated:  March 13, 2014             *s/Paul A. Magnuson*
                                                        Paul A. Magnuson
                                                        United States District Court Judge